## QUAKER INDUSTRIAL ALCOHOL CORPORATION v. BLAIR et al.

District Court, E. D. Pennsylvania. May 2, 1927.

Supplemental Memorandum, May 6, 1927.

No. 3991.

Intoxicating liquors ⬤═69—Refusal of permit to withdraw alcohol for manufacturing purpose held not arbitrary, but discretionary (National Prohibition Act, tit. 2, § 6 [Comp. St. § 10138½c]).

Refusal of permit to withdraw a stated quantity of denatured alcohol per month from warehouse for manufacturing purposes *held* within the discretion of the commissioner, and not arbitrary, but justified by evidence tending to show that the application was not made in good faith, and that the plant of the applicant did not have capacity for using one-half the quantity specified, in view of National Prohibition Act, tit. 2, § 6 (Comp. St. § 10138½c).

In Equity. Suit by the Quaker Industrial Alcohol Corporation against David H. Blair and others. Bill dismissed.

Benj. M. Golder, of Philadelphia, Pa., for plaintiff.

George W. Coles, U. S. Atty., of Philadelphia, Pa., for defendants.

THOMPSON, District Judge. This is a suit in equity, brought under the provisions of sections 5 and 6 of title 2 of the National Prohibition Act (Comp. St. §§ 10138½bb, 10138½c), to review the action of the Commissioner of Internal Revenue, the federal prohibition administrator of Pennsylvania, and the collector of internal revenue in refusing the plaintiff a permit to purchase specially denatured alcohol to be used for the manufacture of ethyl acetate. The plaintiff has, since 1924, been operating, under appropriate permits, an industrial alcohol plant, a denaturing plant, and a bonded warehouse wherein denatured alcohol is stored. On August 27, 1926, the plaintiff made application for the permit, the refusal of which is under review, the purpose of which is to allow it to withdraw from its own bonded warehouse a quantity not exceeding 100,000 gallons of specially denatured alcohol for each 30-day period, and use it in the manufacture of ethyl acetate. The plaintiff, at the time of filing its application, filed its bond with sureties in the sum of $100,000. No action was taken by the defendants up to the date of filing the bill, March 10, 1927.

The bill sets out the operation of the defendant's plants under the permits already granted, and avers a compliance at all times with the laws and regulations applying thereto, and the investment of approximately $600,000 in its plants. It avers that it had constructed, prior to its application, a plant especially equipped for the manufacture of ethyl acetate and had filed copies of the plans thereof with the prohibition administrator with its application in August, 1926; that since that time it has complied with all requests for information as to the method of manufacturing ethyl acetate, and has complied with suggestions for changes in the construction of the plant. It avers that it has received orders for the sale of ethyl acetate, and that there is a demand for the product, but that the defendants have neglected, failed, and refused to grant a permit.

At the time of filing the bill, there had been no formal disapproval or rejection of the application by the prohibition administrator. On March 14, 1927, after the bill was filed, the administrator disapproved of the application upon the ground that it had

not been submitted in good faith. The following day, March 15, 1927, the case was heard upon an application for a preliminary injunction.

The procedure approved and followed by this court, ordinarily, is that in cases of rejection the applicant shall have a right to the judicial inquiry provided for in the act of Congress in cases of revocation, the permit being granted or refused in accordance with the findings made; no original permit, however, after refusal by the prohibition authorities, to issue until reversal on final hearing upon review. In cases of appeal from the refusal of an original application, the court will hear the appeal on the basis of the evidence produced before the trier, and affirm, reverse, or modify accordingly. In the event of either party to a bill for review presenting legal grounds for the introduction of further or additional evidence from that presented before the trier, the court may, on cause shown, refer back the cause to the trier to determine the case in the light of such additional evidence; the cause to be returned to the court within a prescribed time, or otherwise to be determined as the court may decide. The purpose of the time limitation is to give the court control of the cause, in order to prevent the refusal or revocation of a permit to continue in operation indefinitely or for an unreasonable time.

The practice followed in this case may not, therefore, be regarded as a precedent upon bills for review of the action of the prohibition authorities. The hearing of the cause, without having before the court the testimony taken before the prohibition administrator or his trier, arose from the following situation: The case was first heard on March 15 upon the application for a preliminary injunction, based upon the statements in the bill and moving affidavits of unreasonable delay in the action of the prohibition officers and an arbitrary refusal to act. The district attorney, who appeared in court representing the prohibition administrator, acquiesced in the statements of the attorney for the plaintiff in support of those contentions, and the court thereupon, because of that acquiescence, granted a preliminary injunction and ordered that the permit be issued. Subsequently the defendants' answer was filed, and at the hearing on bill, answer, and proofs testimony was taken for both parties.

Under the issues raised in the case, the burden was placed upon the plaintiff of sustaining its contention that the defendants'

action was an unjust and arbitrary exercise of discretion. The action of the administrator was based upon his conclusion that the application was not made in good faith. This conclusion was based in part upon the fact that, in his judgment, the plant was not so located, constructed, and arranged, first, as to have a productive and storage capacity requiring the withdrawal of so large a quantity of alcohol monthly; and, second, as to convince the administrator that all necessary safeguards against diversion of alcohol had been provided for. It was based upon the further fact that, in his judgment, the applicant, through its president, Mr. Freas, acted in bad faith in that certain orders submitted by him to the defendants, as evidence of the quantity of alcohol required in its prospective business, if granted permits, were not bona fide orders, and that the plaintiff had deliberately tried to deceive the administrator as to the nature of the orders.

There were three other issues raised, which may be disposed of before passing upon the two above stated. The objection to the location and arrangement of the plant was not seriously urged. The only objections sustained by the evidence to the character and fitness of the two chemical experts, who are employed in conducting the plaintiff's business, were that they had both been discharged from the positions they had held with large chemical manufacturers by whom they had been employed. The grounds of discharge, as shown, were not such as to reflect in any manner upon their fitness to be intrusted with the operation of the plant, nor to reflect in any way upon their character. As to whether there was undue delay in acting upon the application, it is shown that, although the application was filed in August, the plaintiff's plant was not completed until November, 1926; that since that time the prohibition administrator has been using due diligence in causing investigation to be made along various lines. At all events, delay in action upon the approval or disapproval of an application cannot be considered as ground for ordering the issuance of a permit, unless no facts are shown to justify its refusal.

We come now to the real issue, as to whether the application was made in good faith. It is contended on behalf of the defendants that, upon the facts developed as to the capacity of the plant, the application to withdraw 100,000 gallons per month was not justified, and was evidence of bad faith. From the testimony, I find as a fact

that the maximum capacity of the plant as constructed is not such as to produce more than 60,000 gallons of ethyl acetate, requiring in its manufacture the use of 40,000 gallons of ethyl alcohol. But it is also shown that the capacity of the plant is not sufficient to store that quantity of ethyl acetate.

The position of the administrator is a highly responsible one. It is not necessary here to enlarge upon the fact, of common knowledge, that great quantities of alcohol are being diverted to illicit uses. The administrator must therefore, not only exercise a strict supervision over the plants in operation, but must also exercise his sound discretion in not affording opportunities for violation of the law. As the plaintiff applied for a permit to withdraw up to 100,-000 gallons a month, of which it could not, in the present condition of its plant, use more than one-half, the administrator would be derelict in his duty if he afforded it the opportunity of withdrawing from its warehouse more alcohol than it could legitimately use, taking into consideration the fact that the storage facilities connected with the plant had an outside limit scarcely sufficient to take care of three days' output.

Upon the issue concerning what purported to be pending orders for ethyl acetate, exhibited to the administrator as evidence of the prospective business of the applicant, it is contended for the plaintiff that, inasmuch as the business is in itself a lawful one, an applicant who has built a plant and is prepared to operate to the extent of his plant may trust to business activity in obtaining orders; that therefore, in this case, it was not a matter of pertinent inquiry by the administrator whether or not there were in existence orders which would assure him that the applicant could dispose of his product after manufacture. If that is so, and the applicant had taken that stand, and refused to state whether or not it had orders, or had admitted that it had no orders, the question of the right of the administrator to demand that information would be an issue in the case. Mr. Freas, the president of the corporation applicant, however, did not take that position in his dealings with the administrator.

On the contrary, he produced an order from the Crystal Soap & Chemical Company, Inc., for 250 drums (amounting to 12,500 gallons) weekly, for three months, of ethyl acetate. Upon being questioned, Mr. Freas stated that he had no connection with the Crystal Soap & Chemical Company, Inc. It was shown, however, that Mr. Freas had sold a controlling interest in that company to Mr. Dunn, its president, for $30,000, and had taken his note therefor, which at the time of the investigation remained unpaid. It was testified at the trial that $5,000 had been paid upon the note. Notwithstanding that reduction, the facts were sufficient basis for a conclusion on the part of the administrator that Mr. Freas desired to conceal the fact that he had had an interest, which he had sold, and for which he had not been paid; and, if he had an interest, the fact that he desired to conceal it would justify an inference that the transaction with Mr. Dunn was merely a colorable one, and that its purpose was to use the Crystal Soap & Chemical Company, Inc., as a means of disposing of part of the product of the plant, where it would not be subject to the supervision of the prohibition officers.

The prohibition agents who interrogated Mr. Freas were told that the Charles Cooper Company of New York was to take his entire product. Upon interviewing the officials of the Cooper Company, it was established that they were not dealers in ethyl acetate, but brokers, who sold on commission; that the company had not bound itself to take any part of the applicant's product and had no intention of buying any of it; that the only agreement they would make was to handle the product and offer it to the trade.

Mr. Freas had also informed the prohibition agents that there was a great demand for ethyl acetate; that the Du Pont Company, which produced ethyl acetate, could not supply the demand. The misleading nature of this statement was established by statements from the officers of the Du Pont Company that they manufactured the product entirely for their own use, made no sales, and no effort to supply the trade; that they had never had any difficulty in buying ethyl acetate when they needed it in the open market.

Mr. Freas had also produced a letter from Charles L. Huisking, Inc., stating their belief that they would be able to dispose of considerable quantities of ethyl acetate for him, and requesting him to enter their order for 100 drums per week at a price arranged. Upon inquiry of Charles L. Huisking, Inc., the administrator was informed by letter "that our position is that of brokers and commission merchants, and, as stated to Mr. Freas, of the Quaker Industrial Alcohol Company, any orders that we may

receive for ethyl acetate we would be pleased to turn over to him, but at this time we could not guarantee any specific quantity."

In view of the responsibility put upon the prohibition administrator concerning the withdrawal of such great quantities of alcohol monthly for the purpose of manufacturing ethyl acetate, he was justified in requiring the utmost good faith from those about to engage in the withdrawal of alcohol and the manufacture of a product which may be the means of diversion of the alcohol or the product to unlawful uses, and in refusing to grant a permit if it is evident that the applicant is not dealing with him in good faith. The representations made by Mr. Freas, if true, would be an important factor in determining whether or not he could lawfully use these great quantities of alcohol, and the fact that he did make them indicates that it was his intention that the administrator should be so influenced.

I find from the evidence that Mr. Freas attempted to conceal his connection with the Crystal Soap & Chemical Company, Inc.; that he attempted to convey the false impression that he had orders from the Cooper Company and Huisking, Inc.; that those concerns do not purchase ethyl acetate, but are merely brokers and commission merchants; that he attempted to create a false impression with regard to the Du Pont Company's ability to supply the trade, while the Du Pont Company does not engage in supplying the trade.

In view of these facts, the administrator could come to but one conclusion, when taken in connection with the excessive quantity, over the capacity of his plant, applied for in his permit, and that is that the application was not made in good faith. We apply to the situation here the principle stated by Judge Buffington in Ma-King Products Company v. Blair (C. C. A.) 3 F.(2d) 937:

"The holder of such a permit is intrusted by the government with a power which subjects him to the approaches and bribes of law-breakers, and where, as in this case, the business associations of applicants have been with men whose conduct has already invited prohibition prosecutions against them, it goes without saying that the Commissioner would have been derelict in duty in granting them a permit."

Title 2, § 3, of the Prohibition Act (Comp. St. § 10138½aa), provides that "all the provisions of this act shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented." And if the Commissioner refuses an application for a permit, the applicant "may have a review of the decision by a court of equity," which may "affirm, modify, or reverse" his finding "as the facts and law of the case may warrant."

But, where one comes into a court of equity to have his rights ascertained, he must come with clean hands. As was said by Mr. Justice Sanford in affirming the Ma-King Case, 271 U. S. 479, 46 S. Ct. 544, 70 L. Ed. 1046:

"It is clear that the act does not impose on the Commissioner the mere ministerial duty of issuing a permit to any one making an application on the prescribed form, but, on the contrary, places upon him, as the administrative officer directly charged with the enforcement of the law a responsibility in the matter of granting the privilege of dealing in liquor for nonbeverage purposes, which requires him to refuse a permit to one who is not a suitable person to be entrusted, in a relation of such confidence, with the possession of liquor susceptible of diversion to beverage uses.

"The dominant purpose of the act is to prevent the use of intoxicating liquor as a beverage, and all its provisions are to be liberally construed to that end. It does not provide that the Commissioner shall issue any liquor permit, but merely that he may do so. It specifically requires the application to show 'the qualification of the applicant,' and authorized the Commissioner to prescribe 'the facts to be set forth therein.' These provisions, as well as the purpose of the act, are entirely inconsistent with any intention on the part of Congress that the Commissioner should perform the merely perfunctory duty of granting a permit to any and every applicant, without reference to his qualification and fitness; and they necessarily imply that, in order to prevent violations of the act, he shall, before granting a permit, determine in the exercise of his sound discretion whether the applicant is a fit person to be entrusted with such a privilege. This is emphasized by the provision that, if the Commissioner refuses an application, his action may be reviewed by a court of equity in matter of fact and law; there being no substantial reason for this provision if he is imperatively required to grant a permit upon the mere presentation of an application in due form.

"On the other hand, it is clear that Congress, in providing that an adverse decision of the Commissioner might be reviewed in a

court of equity, did not undertake to vest in the court the administrative function of determining whether or not the permit should be granted, but that this provision is to be construed, in the light of the well-established rule in analogous cases, as merely giving the court authority to determine whether, upon the facts and law, the action of the Commissioner is based upon an error of law, or is wholly unsupported by the evidence or clearly arbitrary or capricious. See Silberschein v. United States, 266 U. S. 221, 225 [45 S. Ct. 69, 69 L. Ed. 256], and cases cited."

As the judgment of the Commissioner in refusing the application is not unsupported by the evidence, nor clearly arbitrary or capricious, and there was ample ground for refusing the permit applied for, it is ordered that the order entered March 15, 1927, be vacated, and the bill dismissed.

### Supplemental Memorandum.

In the opinion filed May 2, 1927, in discussing the reasons why the procedure established by the court in alcohol permit cases was not followed, a statement was made concerning the acquiescence of the district attorney in the statements of the attorney for the plaintiff in support of the contention that there had been unreasonable delay in the action of the prohibition officers and an arbitrary refusal to act. That statement was based upon a recollection of impressions, and not upon a definite recollection of facts occurring at the time of the preliminary hearing.

The district attorney states that he opposed the granting of the preliminary order, and that he objected to its form, when submitted to him by the attorney for the plaintiff, as being in effect a final order upon the prohibition administrator requiring him to issue the permit for which application was made. I have now a recollection of that objection. Support for the statement that there was opposition to the order is also found in the rough minutes taken by the clerk at the hearing.